Argued 4 May, decided 25 May, 1903.

## MAYNARD v. OREGON RAILROAD CO.

[72 Pac. 590]

INJURIES BY CARRIER — PROOFS AND ALLEGATIONS AS TO DAMAGES.

1. Under the rule that whenever the damages sustained do not necessarily arise from the act complained of, they must be specifically designated, a passenger suing for injuries sustained in a railway accident may show that one of his knees was skinned, his hip bruised, that he had pains in the neck, and that his legs would draw and cramp, under allegations of having been thrown down in the car, and bruised on the leg, and of having been wrenched and sprained in the back, whereby a severe contusion of the muscles and nerves resulted.

DAMAGES — ALLEGATIONS AND PROOFS — RAILWAY SPINE.

2. Under a complaint by a passenger for injuries, alleging that he was violently thrown down and greatly injured, being bruised on his leg, and his back being wrenched and sprained, whereby a severe contusion of the muscles and nerves resulted, and that by reason of such injuries he became sick and unable to perform labor, and his health was greatly impaired, and he was permanently disabled, proof of traumatic neurosis, or "railway spine," as it is sometimes called, resulting from concussion, or the shock in consequence thereof, or from fright, is inadmissible.

EVIDENCE — PREJUDICIAL ERROR.

3. In a suit by a passenger for injuries in which proof of traumatic neurosis, resulting from concussion, or consequent shock, or from fright, was inadmissible under plaintiff's complaint, plaintiff's expert witness testified that he found no injury of the spine itself, but only of the muscles outside. After detailing plaintiff's debilitated and nervous condition, and asserting that a number of things might have produced it, he was asked whether, if plaintiff had received a severe injury or sprain of the back, his condition would be the outcome, and answered that, if the sprain, or wrench, or contusion was sufficient, it would. He was then asked if there was a disease known as "railway spine," and the cause of it, and his answer showed that it might be produced by actual injury, together with fright and shock, or that it might be caused by a nervous shock and fright. He was then asked, "You say that you found him laboring under a nervous state — that is, his nervous system was shocked?" to which he answered, "His nervous system is very irritable and weakened." Another expert was asked whether a person thrown down in a wreck might receive a jar or shock that would injure his nervous system or spinal cord, but which would not at first appear to be severe, and might continue for some time before becoming manifest, and answered that he might. *Held*, that the admission of the evidence was prejudicial error, notwithstanding an instruction that damages must be limited to such as might naturally be attributable to the injuries alleged.

EXPERT TESTIMONY MUST BE BASED ON THE EVIDENCE.

4. Hypothetical questions to expert witnesses must be based on facts previously testified to, of which rule this case affords an example: A passenger suing for injuries testified that the collision threw him into a corner of the car, where

he struck something and fell on the floor; that he was thrown down pretty hard, and was hurt in the back, and had a sharp pain there after falling. Expert witnesses for plaintiff testified that they discovered no evidence of injury to his spine, except the inference from his nervous condition. *Held,* that a hypothetical question as to whether a person might receive, by being violently thrown down, or by any severe jar or shock in a wreck, a shock that would injure his nervous system and spinal cord, was unsupported in the evidence.

From Union: ROBERT EAKIN, Judge.

This is an action by H. Maynard against the Oregon Railroad & Navigation Co. to recover damages for a personal injury which plaintiff alleges he sustained October 3, 1902, by reason of the railway train on which he was being carried colliding with another in front, due to the carelessness and negligence of the defendant. *Inter alia,* it is alleged in the complaint that plaintiff " was violently thrown down in the car in which he was at said time a passenger, and was greatly injured, being bruised on his leg, and his back being wrenched and sprained, whereby a severe contusion of the muscles and nerves resulted ; that by reason of the injuries so received the plaintiff became sick, and unable to perform labor since the third day of October, 1902, and his health greatly impaired, and is permanently disabled to perform labor or in any way attend to business, and has received other injuries, in all to his damage," etc. These allegations constitute the gravamen of plaintiff's cause of action, and, having secured a verdict and judgment thereon, defendant appeals.

REVERSED.

For appellant there was a brief over the names of *Cotton, Teal & Minor, Thos. H. Crawford,* and *James G. Wilson,* with an oral argument by *Mr. Crawford* and *Mr. Wilson.*

For respondent there was a brief and an oral argument by *Mr. Leroy Lomax.*

MR. JUSTICE WOLVERTON, after stating the facts in the foregoing language, delivered the opinion.

1. The errors relied upon for a reversal are based upon the admission of testimony, instructions given to the jury, and others asked on the part of the defendant and refused. Defendant's counsel first complain that plaintiff was permitted to show that he was "skinned on the knee and bruised on the right hip," that sharp pains extended into his neck, and that "his legs would draw and cramp"; and they insist that the complaint contains no allegations of any injuries such as these.   They say (quoting from their brief): "It is not claimed in the complaint that plaintiff's knee was skinned or injured, or that his hip was bruised, or that his neck was injured, or that he had cramps in his legs as a result of the injuries received by him in the wreck."   While these specific or exact injuries or symptoms of hurt are not set out and localized upon the person by the allegations of the complaint, it is manifest that they are such as might naturally be expected to arise or ensue from such as are alleged.   It does not require an exaggerated stretch of reason to infer that a passenger had his knee skinned or his hip bruised from an affirmation that he was bruised on his leg, or that sharp pains extended to the neck, and that his legs would draw and cramp from a wrench of the spine, whereby severe contusions of the muscles and nerves resulted.   Being such as might very naturally and consistently result from the injuries specified, it was proper to permit them to be shown.   The general rule, as stated in *De Forest* v. *Leete*, 16 Johns. 128 (quoting from 1 Chitty on Pleading), is that "whenever the damages sustained do not necessarily arise from the act complained of, and, consequently, are not implied by law, in order to prevent the surprise on the defendant which otherwise might ensue on the trial the plaintiff must, in general, state the particular damage which he has sustained, or he will not be permitted to give evidence of it."

*43 Or.—5.*

This rule was applied by Mr. Justice CAMPBELL in *Shadock v. Alpine Plank-Road Co.* 79 Mich. 7 (44 N. W. 158), to the exclusion of testimony showing fractures of the shoulder, arm, and hand, and a temporary sprain of the hip, not only producing temporary pain, but, as was claimed, permanent injury and some disability, under an allegation that plaintiff was bruised, hurt, and injured.   Such conditions did not necessarily result from the injuries designated by the allegations of the complaint.   Quite a different condition of things exists in this case.   Those injuries or symptoms of hurt sought to be shown here might very naturally arise or result from such as were alleged to have been received by plaintiff, or at least they were not so remote and disconnected as to cause surprise, and a consequent disadvantage to the defendant in permitting their proof.   There was no error in this respect.

2. The plaintiff, being called as a witness in his own behalf, testified among other things, that he was fifty-three years of age; that he was riding in the small room or smoker, and was in the act of getting on his feet when the collision threw him ahead into the corner of the car, where he struck something, and fell on the floor; that he was thrown down pretty hard; that he could not say whether he was standing up straight or just getting up, but thought he was just getting up; that he was hurt in the back, skinned on the knee, and bruised on the right hip; that he had a sharp pain in his back after falling — a sharp, cutting pain; that, after being hurt, he tried to work the best he could for a couple of days, but had to quit, and that his back was so lame at night he could hardly turn over in bed; that he had not been able to work since that time; that prior to the collision his health was good, so that he was able to do all kinds of manual labor; that since the injuries he suffered with a pain in his back; that it kept him in bed a good share of the time; that he

could get around, but could not work; and that this condition had continued since the injury to the present time. On cross-examination he testified that he first thought he was severely bruised and jammed, and would get over it in a few days; that it was during the second week after he came back that he tried to work; that when he was thrown down he struck on his head and hip, struck his head against something, and then went down on the floor; that he walked from the car to the depot with John Ross; that he did not make any complaint to him; that he thought at the time that it was a severe wrench or bruise, but that he would get over it all right; that he had never had any trouble with or injury to his back theretofore, never suffered with his back with lumbago or other trouble; and, on further examination in chief, that he weighed on October 2d, before he was injured, 162 pounds, but that about two weeks prior to his examination (February 18, 1903,) he weighed about 139 pounds; that after the collision, and prior to consulting Doctor Ewin, he had pains in his back—sharp pains running up and down his back and neck; that when he was first thrown on the floor there was a sharp pain in his back, and after that he felt more of a numbness; that these pains would catch him in his back, and run up and down, and his limbs would draw and cramp; that the shooting pains he spoke of did not commence to be very severe until about a couple of weeks — about the time he went to Doctor Cromwell—but that it hurt him all the time in the back.

Doctor Ewin, being called, testified, in substance, that he first began treating plaintiff November 14th; that he made a careful examination of him at the time as to his condition and health; that he found he had some tenderness in the back and left hip, considerable tenderness in the spinal column, and some rigidity of the muscles of the back; that he found no indications of any bruising or any

discoloration of the skin; that he learned from him that he had been suffering for several days or weeks from pain and contraction of the muscles of his legs and back at night, loss of sleep and appetite, shooting pains through his back and the back of his head, going down to his feet, and a twitching of the muscles of the legs and back. The following question was then propounded: "I will ask you to state this, doctor: Did you find an injured condition of the spine in any way during your examination?" to which he was permitted to answer, over objection, "I found no injury of the spine proper; only the muscles outside." The witness further testified, over objection, that from the present appearance of the man he was very nervous, weak, and debilitated generally; his hands were unsteady, and his walk and all his deportment was that of a person who was very nervous, and very much weakened; that a number of things might have produced this condition; that at the present time his condition is somewhat improved in a general way; that the nervous effects are not so pronounced, and he is better nourished in the way of taking food, sleeps better, and does not have the severe muscular cramping, but there is a weakened and debilitated condition of the nervous system, and that the seat of plaintiff's trouble seems to be in his nervous system — in the spinal column. Thereupon witness was interrogated and answered as follows: "I will ask you to state this, doctor: If a party or if a plaintiff should have received in a collision a severe wrench of the back, or sprain of the back, or if he should receive a severe wrench of the back from any cause, would the result, or the conditions you find this plaintiff in be the outcome or results of that? A. In the event that the sprain or wrench or contusion of the spinal column is sufficient, or a severe sprain of the nerves or spinal cord, it would. Q. Doctor, is there a disease known to the medical profession known as the 'railway spine'?

A. There is a condition that has been termed railway spine.
Q. Well what is that caused by, doctor? A. Railway spine
is a condition, as ordinarily termed, that frequently hap-
pens in severe railroad wrecks, where an individual may
be actually injured severely or more or less mildly, and
that, taken together with the fright that usually accompa-
nies it, and the shock, and even where the individual is not
injured physically, and there is only a nervous shock, that
with the scare or fright makes up what is called railway
spine, or the conditions resulting from that. * * Q. Now,
in your examination of the plaintiff, did you find that—
state whether or not you found that his back had been
wrenched or sprained in any way? A. I found no indica-
tion conclusive as to that point at all. * * Q. You could
not say, then, by your examination of the plaintiff, whether
or not he had ever received a severe wrench in the way
of a wrench or sprain of his back, could you? A. No, sir.
There were no indications of that. I could not say what his
condition was from the indications I found. Q. You say
that you found him laboring under a nervous state; that
is, his nervous system was shocked. Isn't that the case?
A. His nervous system is very irritable and weakened.
That is the condition I find him in."

Doctor Biggers was then called, and testified to the same
effect, in substance, as Doctor Ewin, as to the plaintiff's
physical condition, and, among other things, that he was
unable to find any objective evidence whatever of spinal
injury. Thereupon the following question was propounded
to him: "Now, doctor, I will ask you if it is not a fact
that a party might receive, by being violently thrown
down, or by receiving any severe jar or shock such as in
a wreck or collision where a train has struck any object
with great force, or anything of that kind, is it not a fact
that any party might receive a shock that would injure
his nervous system and his spinal cord, and that injury

might not be severe, and might continue for some time before it would make itself manifest, or anything of that kind?" to which he answered, over objection: "Yes, that is correct. There might be a spinal injury that would develop in the speck condition — that is, in the pus adjacent to the nerve tissue — and would manifest itself after the injury, and progress worse. These cases generally progress worse, and usually terminate fatally." There was other testimony by medical practitioners of the same nature, but the foregoing is ample to indicate the basis for the questions presented.

It is first insisted that the question as to whether or not plaintiff was afflicted with railway spine as a result of a nervous shock or fright sustained at the time of the collision is beyond the scope of the complaint; and, second, that the hypothetical question put to Doctor Biggers was not proper, as not being based upon facts in evidence. Of these in their order.

Medical science treats of a condition currently denominated "railway spine," or, in a more technical sense, "traumatic neurosis." It is latterly denied by strong authority that any such a malady exists as a concussion of the spine or spinal cord, which term is also often used as a synonym for railway spine, but that the symptoms which were supposed to indicate a concussion of the spine are but indications of a concussion of the brain, which may involve a psychic as well as a physical injury, one or both. Such a condition as traumatic neurosis may, it is said, result from actual lesion of the vertebral column, accompanied by immediate and definite signs of such lesion; but it may also result, according to medical science, from a nervous shock or sudden fright, involving a psychical condition as well as a nervous derangement and impairment, where there are no outward physical or objective signs or indications of physical lesion of any character.

It is clear that evidence relative to both phases of this peculiar disorder or malady, as it may have affected the plaintiff, has gone to the jury.   The question, therefore, whether the complaint will admit of so broad a range of investigation is fairly presented.   Unlike the question first discussed, railway spine, or traumatic neurosis, is not a sequence or result that follows as of course, or may, within reasonable inference, from a bruise on the leg, a wrench or sprain of the back, or contusion of the muscles and nerves.   Such an affliction or malady may or may not result or spring from injuries of that nature, dependent upon the seriousness or severity of the injuries, and it is not, therefore, necessarily consequent.   But it may arise from another and entirely distinct source — that is, from a concussion, followed by a shock of such proportions as vitally to affect and impair the nervous system, or a sudden fright, producing psychic or mental traumatism ("trauma" meaning a wound, and is generally used as synonymous with "injury"), which may lead to a multitude of derangements and suffering, and this without lesion of the nerves or contusion apparent objectively.   So that the malady arising from this latter source could not, by any sort of gerrymandering or logic, be said to spring from a sprain, bruise, or contusion, and the like.   It would be absurd to so contend.

A shock is defined by Charles L. Dana, M. D., as a sudden depression of the vital functions, especially of the circulation, due to the nervous exhaustion following an injury or a sudden violent emotion, resulting either in immediate death or in prolonged prostration, and is spoken of as being either corporeal or psychical, relating respectively to the vital powers and the emotions of the mind.   Concussion, as applied to the brain, is a jarring of the brain substance without laceration of its tissue, or with only microscopical laceration.   As applied to the spine, if it still be admitted

that such a condition may exist, is meant a condition of the spinal cord produced by a violent shock: "A System of Legal Medicine," vol. 2, pp. 297, 298. Again, the learned author says: "Concussion is the physical jar; shock is the effect. Shock resulting from concussion is called 'corporeal'; but almost the same class of symptoms can be produced by great emotion, and this form of shock is called 'psychical' ": "A System of Legal Medicine," vol. 2, pp. 303, 304. Now, a concussion producing a shock without lesion, or a fright producing great emotion, leading to serious affliction or suffering, is quite a different thing from a sprain or contusion of the muscles and nerves, which might or might not lead to the same deleterious result. The latter is practically what is charged in the complaint; not the former. Having alleged the latter and omitted the former, the defense would naturally not prepare to meet the conditions, as it otherwise would where it has been led to believe that the plaintiff is relying for recovery wholly upon injuries produced by physical sprains, bruises, and contusions. The disorder being frequently insinuative in its progress and development, and subject to arise from a number of causes, it would seem that a party called upon to defend against its consequences should be apprised by appropriate allegations of the cause relied upon to produce it, and it would be misleading and vexatious to allege one cause and be permitted to prove another. We think, therefore, the complaint is insufficient to admit of proof of railway spine, or traumatic neurosis, arising or resulting from concussion, or the shock in consequence thereof, or from fright.

3. Now, if we follow the testimony, it is very easy to see how injuriously the defendant may have been affected by the mode in which the plaintiff was permitted to proceed in the introduction of his testimony. Doctor Ewin testified that he "found no injury of the spine proper; only

the muscles outside." Then, after detailing plaintiff's de-
bilitated and nervous condition, and asserting that a
number of things might have produced it, he was asked,
if the plaintiff had received in a collision, or from any
cause, a severe injury or sprain of the back, whether the
condition he found him in would be the outcome or re-
sult of that.   He answered, "In the event that the sprain
or wrench or contusion of the spinal column is sufficient,
or a severe sprain of the nerves or spinal cord, it would."
Thus far there could be no hurt to the defendant.   Then
he was asked point blank if there was a disease known to
the medical profession as "railway spine." Having an-
swered in the affirmative, he was asked the cause of it, and
his answer revealed that it might be produced by an actual
injury, severe or more or less mild, together with the
fright and the shock that usually accompanies it; and,
further, that it might be produced where the individual is
not injured physically, and there is only a nervous shock
with a scare.   He then again reiterates that he found no
indications that plaintiff had ever received a severe injury
in any way, or wrench or sprain of the back, and that he
could not say what his condition was from the indications
found.   This was followed by the inquiry, "You say that
you found him laboring under a nervous state; that is,
his nervous system was shocked.   Isn't that the case?"
to which he answered: "His nervous system is very irrit-
able and weakened.   That is the condition I find him in."
Following in the wake of this, Doctor Biggers was asked,
in effect, whether or not a person, by being thrown down
in a wreck or collision, might receive a jar or a shock that
would injure his nervous system or spinal cord, which in-
jury might not at first appear to be severe, and might
continue for some time before making itself manifest, and
answered that he might.   So that here was manifest a pur-
pose to press upon the attention of the jury the results

that might arise from a shock to the nervous system alone, without personal injury, or a fright in conjunction with such as might naturally arise from the physical injuries alleged in the complaint, and the procedure was surely harmful to the defendant. It is true that by instruction No. 2 the jury was very properly limited in its findings to such damages as might naturally be attributable to the injuries alleged. But the injurious testimony was not withdrawn, and, for aught the court may know, influenced the verdict returned.

4. Further than this, there was no such fact in evidence as that the plaintiff received a severe jar or shock upon which to base the hypothetical question put to Doctor Biggers. The plaintiff himself failed to testify to such a circumstance, and the physicians failed to establish it, except as an inference from the condition in which they found the patient, and it was error to permit the question to be answered: 8 Ency. Pl. & Pr. 757; *State* v. *Anderson*, 10 Or. 448; *Bomgardner* v. *Andrews*, 55 Iowa, 638 (8 N. W. 481); *Guetig* v. *State*, 66 Ind. 94 (32 Am. Rep. 99); *Quinn* v. *Higgins*, 63 Wis. 664 (24 N. W. 482, 53 Am. Rep. 305); *Reber* v. *Herring*, 115 Pa. 599 (8 Atl. 830); *Rowe* v. *Such*, 134 Cal. 577 (66 Pac. 862, 67 Pac. 760); *Fuller* v. *City of Jackson*, 92 Mich. 197 (52 N. W. 1075).

Further errors have been assigned, but, as the case must go back because of those referred to, it is deemed unnecessary that we should consider them now, as the same questions are not likely to arise again. The cause will be reversed, and remanded for such further proceedings as may be proper, not inconsistent with this opinion.

REVERSED.